UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

JAMES McMILLAN,                    :    12 Civ. 302 (JG) (VVP)

              Plaintiff,           :

-against-                          :

NEW YORK STATE BOARD OF ELECTIONS, :

              Defendant.           :

----------------------------------X


**MEMORANDUM OF LAW OF DEFENDANT STATE BOARD OF ELECTIONS
IN OPPOSITION TO APPLICATION FOR A RECANVASS
OF THE VOTES FOR THE 2010 GUBERNATORIAL ELECTION**


                          ERIC T. SCHNEIDERMAN
                          Attorney General of the
                            State of New York
                          **Attorney for Defendant**
                          120 Broadway – 24th Floor
                          New York, NY 10271-0332
                          (212) 416-8645
                          FAX (212) 416-6009
                          Joel.Graber@ag.ny.gov


LITIGATION BUREAU:

JOEL GRABER
Special Litigation Counsel
  of Counsel

February 21, 2012

**TABLE OF CONTENTS**

Page

Preliminary Statement ................................. 1

Facts Pertinent To Plaintiff's Application ............ 3

New York Law Governing Party Status ................... 4

Standard For Injunctive Relief ........................ 5

Argument  PLAINTIFF FAILS TO MEET THE STANDARDS
          FOR INJUNCTIVE RELIEF ....................... 7

    A.    Plaintiff Has Failed To Demonstrate
          A Likelihood Of Success On The Merits ..    7

          1.    The Eleventh Amendment Bars
                This Action........................    7

          2.    The State Board Is Not A Person
                Subject To 42 U.S.C. § 1983 .......    10

          3.    Plaintiff's Claims Concerning The
                2006 Election Are Barred By The
                Statute Of Limitations ............    10

          4.    The Recanvassing Of The Results
                Of New York's 2010 Gubernatorial
                Election Has Already Taken Place ..    11

          5.    Plaintiff Slept On His Rights
                To Obtain State Judicial
                Intervention ......................    14

          6.    There Is No Clear Or Substantial
                Likelihood Of Success On A Claim
                Of Religious Discrimination .......    17

    B.    Plaintiff Has Failed To Demonstrate
          The Likelihood Of Irreparable Harm In
          The Absence Of A Mandatory Injunction ..    18

-i-

              C.    The Balance Of Hardships Favors
                    The State Because The Public Interest
                    Would Be Disserved By The Issuance
                    Of A Preliminary Injunction ............    19

Conclusion ...........................................    21

Appendices

    A.    Complaint, filed on January 23, 2012 (Doc.
          # 1 in this Court's docket).

    B.    Plaintiff's memorandum of law, filed on January 23,
          2012 (Doc. # 3 in this Court's docket).

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

JAMES McMILLAN,                     :    12 Civ. 302 (JG) (VVP)

              Plaintiff,            :

-against-                          :

NEW YORK STATE BOARD OF ELECTIONS, :

              Defendant.            :

----------------------------------X

## MEMORANDUM OF LAW OF DEFENDANT STATE BOARD OF ELECTIONS IN OPPOSITION TO APPLICATION FOR A RECANVASS OF THE VOTES FOR THE 2010 GUBERNATORIAL ELECTION

### Preliminary Statement

This memorandum of law is respectfully submitted by ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, attorney for defendant New York State Board of Elections (the "State Board"), an agency of the Executive Department of the State of New York, in opposition to plaintiff's application, and in response to this Court's order directing the State Board to show cause "why a recount should not be ordered of all ballots (absentee or otherwise) from the 2010 election for Governor of New York in which Jimmy McMillan was a candidate" (Minute Entry entered on January 24, 2012).

Also submitted herewith is the declaration of Anna E. Svizzero, Director of Election Operations at the State Board, dated February 16, 2012 ("Svizzero decl."), with exhibits.

Plaintiff's application should be denied in its entirety. Plaintiff is not entitled to a preliminary injunction because he has not met the stringent standards for a mandatory injunction which would require a recount of 4,763,688 paper ballots cast in the 2010 gubernatorial election.[1]

Part of plaintiff's failure to meet the standards for a mandatory injunction is that this action is barred by the Eleventh Amendment, as this Court has already held, and the Second Circuit has affirmed, in another case concerning the 2010 gubernatorial election. The State Board is an agency of the Executive Department of the State of New York, pursuant to N.Y. Election Law § 3-100(a). See McMillan v. New York State Bd. of Elections, 2010 WL 4065434, *3 (E.D.N.Y. Oct. 10, 2010) (Gleeson, D.J.) (also concerning the 2010 gubernatorial election), aff'd, 2011 WL 6061356, *1 (2d Cir. Dec. 7, 2011) ("The district court correctly dismissed McMillan's claims against the State Board as barred by the Eleventh Amendment.").

As set forth in detail below, aside from the Eleventh Amendment bar, plaintiff's papers do not even state a reason why almost five million paper ballots cast and canvassed in November 2010 should be recounted by the 57 county boards of election and by the New York City board.

---

[1] See www.elections.ny.gov/NYSBOE/elections/2010, stating the certified results of the 2010 election for Governor.

While the complaint alleges that the word "Damn" was taken out of plaintiff's party's name, "The Rent Is Too Damn Party," in 2006, not in 2010 (complaint ¶ 4),[2] the word "Damn" *was* on the gubernatorial ballot in 2010. The 2010 litigation before this Court resulted in shortening plaintiff's party's name, so that it would fit on the ballot, by substituting "2" for "Too," not by eliminating the word "Damn." <u>McMillan v. N.Y. State Bd. of Elections</u>, 2010 WL 2607272, *1 (E.D.N.Y. Jun. 25, 2010) (Gleeson, D.J.). Plaintiff does not assert otherwise, and has not come forward with any evidence, much less sufficient evidence to support his application for a recanvass.

Plaintiff's motion therefore fails to meet the requirements for mandatory injunctive relief, because the action is barred by the Eleventh Amendment, and for other reasons demonstrated below, and should be denied.

### Facts Pertinent To Plaintiff's Application

Plaintiff ran for Governor in 2010 and received 41,131 votes (.0086%). The 2010 gubernatorial election saw 4,763,688 votes cast. <u>See</u> www.elections.ny.gov/NYSBOE/elections/2010. The winner of the 2010 election for Governor received 2,903,516 votes - plaintiff was 2,862,384 votes short in that "race."

---

[2] Plaintiff's complaint (Doc. # 1 in this Court's docket), is appended to this memorandum of law as Appendix A. Plaintiff's memorandum of law (Doc. # 3 in this Court's docket), is appended to this memorandum of law as Appendix B.

The Supreme Court has made clear that the purpose of
elections is to elect public officials, not for the purpose of
facilitating the general expression of protest or discontent.

See, e.g., Burdick v. Takushi, 504 U.S. 428 (1992):

> Attributing to elections a more generalized
> expressive function would undermine the
> ability of States to operate elections
> fairly and efficiently.

Id. at 438 (quoting Storer v. Brown, 415 U.S. 724, 730-35
(1974)).

Ballot access is not an issue here; plaintiff was on the
ballot. However, liberal ballot access does not mean that
plaintiff - who is not himself a political party - is entitled
to formal party status without meeting the statutory
requirements discussed in the next section of this memorandum of
law.

### New York Law Governing Party Status

As this Court has noted, "[u]nder New York election law,
political organizations are defined as either 'parties' or
'independent bodies.' A 'Party' is any political organization
whose candidate in the preceding gubernatorial election received
at least 50,000 votes. N.Y. Elec. Law § 1-104(3). An
organization that participates in the campaign and election
process but did not receive the requisite number of votes in
that election to achieve 'Party' status is defined as an

'independent body.' Id. at § 1-104(12)." Dillon v. New York State Bd. of Elections, 2005 WL 2847465, *1 (E.D.N.Y. Oct. 31, 2005) (Gleeson, D.J.).[3]

As this Court held, "[v]arious [statutory] consequences flow from an organization's status as either a Party or independent body." Dillon, 2005 WL 2847465 at *1. Plaintiff's emphasis is that "[t]he achievement of [the 50,000-vote] minimum confers official status to a party, and allows it to participate in the primary process instead of the independent nomination petition course for its candidates as provided in [N.Y. Election Law § 6-138(4)]." Johnson, 595 F.Supp. at 1129.[4]

## Standard For Injunctive Relief

The Supreme Court and the Second Circuit have recently made clear that a mandatory injunction affecting governmental action taken in the public interest pursuant to a statutory or regulatory scheme requires that plaintiff demonstrate four elements: (1) a clear or substantial likelihood of success on merits; (2) that plaintiff is likely to suffer irreparable

---

[3]     See also, e.g., Johnson v. Cuomo, 595 F.Supp. 1126, 1129 (N.D.N.Y. 1984) ("the minimum of 50,000 [is] fair and sensible, and by no means an unconstitutional obstacle to qualify for the privilege of official party status"); Person v. New York State Bd. of Elections, 467 F.3d 141, 143-44 (2d Cir. 2006) (same).

[4]     Plaintiff recently announced that he is running for president (see http://jimmymcmillan.org).

injury in absence of injunction; (3) the balance of hardships between plaintiff and defendant must tip in plaintiff's favor; and (4) the court must ensure that the public interest would not be disserved by issuance of preliminary injunction. See Salinger v. Colting, 607 F.3d 68, 79-82 (2d Cir. 2010) (citing eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391-94 (2006)); Monserrate v. New York State Senate, 599 F.3d 148, 154 (2d Cir. 2010) (concerning voting rights) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)); Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006) (requiring "clear" or "substantial" likelihood of success) (citing No Spray Coalition, Inc. v. City of New York, 252 F.3d 148, 150 (2d Cir. 2001)).

Requiring the 57 county boards of election, and the New York City board, to "recount" almost five million paper ballots from 2010 - all ballots are on paper now with the new voting technology employing optical scanners - would be an extreme, and exorbitantly costly, mandate to the State's political subdivisions, which are not even parties to this action. See Svizzero decl. ¶ 15.

- 6 -

#### Argument

### PLAINTIFF FAILS TO MEET THE STANDARDS FOR INJUNCTIVE RELIEF

### A.   Plaintiff Has Failed To Demonstrate A Likelihood Of Success On The Merits.

Plaintiff has failed to demonstrate the clear or substantial likelihood of success on the merits required for the extraordinary order he now seeks.

As a threshold matter, plaintiff will be unable to overcome the Eleventh Amendment bar, and thus has no clear or substantial likelihood of success on the merits.

Further, although plaintiff's claims are not framed in conventional legal terms, and he does not identify under which federal constitutional provision or statute he has brought this action (see complaint ¶ 3 [Appendix A], and his memorandum at Appendix B), he may be attempting to assert (1) a First Amendment claim based on religious discrimination (see complaint id.), and/or (2) "other types" of unspecified civil rights violations (plaintiff's memorandum at ¶ 4 [Appendix B]).

None of plaintiff's claims can survive even minimal scrutiny, and the present application should therefore be denied.

### 1.   The Eleventh Amendment Bars This Action.

To the extent that plaintiff has sought to bring a § 1983 action, alleging religious or "other types" of discrimination

(see plaintiff's memorandum at ¶ 4 [Appendix B]), the Eleventh
Amendment deprives the federal courts of jurisdiction over "any
suit in law or equity, commenced or prosecuted against one of
the United States by Citizens of another State." U.S. Const.
amend. XI.

The Supreme Court has interpreted this bar to extend to
suits under state or federal law against a State by its own
citizens, unless the State consents to the suit or Congress has
validly abrogated the states' sovereign immunity. See Seminole
Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996); Richardson v.
N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 449 (2d Cir.
1999) (affirming dismissal of state law claims on Eleventh
Amendment grounds), abrogated on other grounds by Burlington N.
& Santa Fe Ry. v. White, 548 U.S. 53 (2006).

This immunity applies whether the suit seeks damages or
equitable relief, and extends "not only to a state, but also to
entities considered 'arms of the state.'" McGinty v. New York,
251 F.3d 84, 91, 95 (2d Cir. 2001). See Gan v. City of N.Y., 996
F.2d 522, 529 (2d Cir. 1993).

As this Court already recognized before McMillan's 2010
suit, the State Board is entitled to Eleventh Amendment
immunity. Iwachiw v. N.Y. City Bd. of Elections [and New York
State Bd. of Elections], 217 F.Supp. 2d 374, 380 (E.D.N.Y.
2002), aff'd, 126 F.App'x 27, 28 (2d Cir. 2005) (summary order).

- 8 -

The factors that the district courts within this Circuit consider to determine whether an entity is an arm of the State include, among others, "how the entity is referred to in the documents that created it," "how the governing members of the entity are appointed," and "whether the entity's function is traditionally one of local or state government." Mancuso v. N.Y. State Thruway Auth., 86 F.3d 289, 293 (2d Cir. 1996).

Here, the State Board is defined by state law as an agency within the New York State Executive Department, see N.Y. Election Law § 3-100(1); its Commissioners are appointed by the Governor, see id.; and its functions are traditionally one of state government, including the authority to "issue instructions and promulgate rules and regulations relating to the administration of the election process, election campaign practices and campaign financing practices." Id. § 3-102(1).

The State Board has not consented to this suit, and plaintiff has not identified any congressional abrogation of sovereign immunity that would cover his claims. Cf. Quern v. Jordan, 440 U.S. 332, 345 (1979) (§ 1983 does not abrogate state sovereign immunity). Because the State Board is an arm of the State of New York, plaintiff's claims against it are barred whether they are based on federal or state law, and whether they seek damages or equitable relief.

As noted, this Court so held in 2010. McMillan v. New York State Bd. of Elections, 2010 WL 4065434, \*3 (E.D.N.Y. Oct. 10, 2010) (Gleeson, D.J.), aff'd, 2011 WL 6061356, \*1 (2d Cir. Dec. 7, 2011) ("The district court correctly dismissed McMillan's claims against the State Board as barred by the Eleventh Amendment.") (citing Iwachiw).

Here, as in 2010, there is neither waiver nor abrogation, and the Eleventh Amendment therefore absolutely bars this action.

### 2. The State Board Is Not A Person Subject To 42 U.S.C. 1983.

To the extent that this action is purported to have been brought pursuant to 42 U.S.C. § 1983, plaintiff's claims for relief against the State Board fail for the additional reason that neither the State nor its departments and agencies - including the State Board - qualify as a "person" covered by § 1983, and therefore it may not be sued under that section. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).

### 3. Plaintiff's Claims Concerning The 2006 Election Are Barred By The Statute Of Limitations.

Plaintiff's complaint and memorandum both make reference to the 2006 gubernatorial election: Complaint ¶ 4 (Appendix A); memorandum ¶ 1 (Appendix B).

As this Court ruled in dismissing plaintiff's 2010 action (McMillan, 2010 WL 4065434, at \*4), his claims concerning the

- 10 -

2006 election were time-barred. The Second Circuit affirmed on
that ground, as well as on the ground of the Eleventh Amendment
bar. McMillan, 2011 WL 6061356, *1 (2nd Cir. Dec. 7, 2011). See
also Murawski v. Pataki, 514 F.Supp.2d 577, 583 (S.D.N.Y. 2007)
(applying limitations rule to election claims involving
independent candidate).

Accordingly, plaintiff's claims, if any, about the State
Board's actions in 2006 are time-barred.

## 4. The Recanvassing Of The Results Of New York's 2010 Gubernatorial Election Has Already Taken Place.

There is no basis for this Court to order a second recount
- the Election Law term is "recanvass" - of the results of New
York's 2010 gubernatorial election. All 4,763,688 ballots cast
in that election, including blank and void ballots, were
required to be recanvassed 15 days after the election. See N.Y.
Election Law § 9-208; Svizzero decl. ¶ 5.

Section 9-208(1) provides, in pertinent part:

> Within fifteen days after each general . . .
> election, . . . the board of elections, or a
> bipartisan committee of or appointed by said
> board shall, in each county using ballot
> scanners, make a record of the serial number
> of each ballot scanner used in each election
> district in such general . . . election.
>
>         * * *
>
> Such board of elections . . . shall
> recanvass the tabulated result tape from
> each ballot scanner used in each election
> district by comparing such tape with the

- 11 -

> numbers as recorded on the return of
> canvass. The said board . . . shall also
> make a recanvass of any election day paper
> ballots that have not been scanned and were
> hand counted pursuant to [N.Y. Election Law
> § 9-110(2)] and compare the results with the
> number as recorded on the return of canvass.
>
> The board . . . shall then recanvass write-
> in votes, if any, on ballots which were
> otherwise scanned and canvassed at polling
> places on election night. The board . . .
> shall validate and prove such sums.
>
> Before making such canvass the board of
> elections, with respect to each election
> district to be recanvassed, shall give
> notice in writing to the voting machine
> custodian thereof, to the state and county
> chair of each party or independent body
> which shall have nominated candidates for
> the said general . . . election . . . and to
> each individual candidate whose name appears
> on the office ballot, of the time and place
> where such canvass is to be made; and the
> state and county chair of each such party or
> independent body and each such individual
> candidate may send a representative to be
> present at such recanvass. Each candidate
> whose name appears on the official ballot,
> or his or her representative, shall have the
> right personally to examine and make a
> record of the vote recorded on the tabulated
> result tape and any ballots which were hand
> counted.

Furthermore, pursuant to N.Y. Election Law § 9-211, the
local boards of election were required to conduct mandatory
audits of 3% of the voting machines, as an additional safeguard
to ensure an accurate election was conducted using optical scan
voting systems. See Svizzero decl. ¶ 9.

- 12 -

As required by State Board regulations applicable statewide, set forth at 9 NYCRR 6210.18(b), local boards of election were required to notify all candidates of the "date, time and location" of the local mandatory audits. Thus, candidates were to have been given advance notice about the entire process, and had a right to participate in every step of the process.

Plaintiff does not allege or adduce any proof regarding lack of notice by the local boards of these processes and safeguards, nor does he allege, much less adduce proof, that he lacked the opportunity to participate in those various processes described herein. See Svizzero decl. ¶ 14.

Provided herewith is a copy of a template notice provided to the local boards of election including the city board by the State Board. See Ex. A to Svizzero decl., entitled "Notice to Candidates and Party Chairs," concerning (1) the opportunity to inspect the voting equipment, (2) notice with respect to the initial canvass of absentee, special and affidavit ballots, (3) re-canvass by the boards, and (4) the post-election audit.

Svizzero decl. Ex. B is a copy of a "Notice to All Candidates," provided by the city board to the State Board, in which the city board informed candidates about (1) a test of the scanners, (2) inspection of election day paper ballots, (3) the BMD audio ballots, (4) the board's random draw of scanners for

audits, (5) the audit of the scanner results, and (6) the canvass and/or recanvass of poll site ballots, emergency ballots, absentee, military and special federal ballot.

Svizzero decl. Ex. C is a copy of a schedule of the 57 local boards of elections and the city board informing the various candidates about the date of the 3% audit drawing, the date of the 3% audit, the date of counting absentee ballots, and the date of recanvass of votes cast on scanners. Again, plaintiff fails to allege or adduce any proof that he did not receive the required notifications.

Under the circumstances, with plaintiff having made no factual allegations, much less adduced proof to support a federally-ordered second "recount," i.e., recanvass, in addition to the recanvass already performed, the application should be denied in its entirety.

### 5.    Plaintiff Slept On His Rights To Obtain State Judicial Intervention And Should Not Be Able To Proceed In This Forum.

Plaintiff slept on his rights with respect to the November 2010 gubernatorial election for more than a year, until filing this action on January 23, 2012 (see complaint [Appendix A]).

After the audit procedure described above, which would by statute have been completed in November 2010, plaintiff had the statutory right to petition the court to contest the election results as reported.

- 14 -

N.Y. Election Law § 16-106(2) provides, in pertinent part:

> The canvass of returns by the . . . board of
> canvassers [the local boards of election]
> may be contested, in a proceeding instituted
> in the supreme court by any voter . . . .

A special proceeding pursuant to Section 16-106(2) was
required to have been instituted "within thirty days after the
election or alleged erroneous statement or determination was
made, or the time when the board shall have acted in the
particulars as to which it is claimed to have failed to perform
its duty . . . ." N.Y. Election Law § 16-106(5).

The date for plaintiff to have challenged the vote count
was, therefore, in December 2010, more than a year before this
action was filed.

Apparently aware that he failed to bring a timely
proceeding, plaintiff asserts as follows:

> I would have ask for a Re-Count sooner the
> case was being appealed, and I had asked the
> Court to ORDER Rent Is 2 Damn High Party on
> the ballot for the next (4) four years 1012
> - 2013 - 2014 - 2015. A SUMMARY ORDER -
> MANDATE ISSUED ON 10/20/2012. I could not
> file for a Re-Count until I received this
> ORDER from the US Court of Appeal.

Complaint ¶ 4 at 2 (Appendix A).[5]

The foregoing argument does not justify failing to pursue
an available state court remedy under N.Y. Election Law § 16-

---

[5]    Although plaintiff refers to a "MANDATE ISSUED ON
10/20/2012," the Second Circuit's mandate issued on January 12,
2012 (Doc. # 81 in the Second Circuit's docket).

106(2) in 2010. In fact, it is unclear what plaintiff's appeal
from this Court's 2010 dismissal truly concerned, judging by his
appellant brief, dated February 15, 2011 (Doc. # 22 in the
Second Circuit's docket), since plaintiff had agreed to the
substitution of "2" for "Two," for ballot format purposes only,
in open court before this Court. McMillan, 2010 WL 2607272 at
*1. See also memorandum, supra, at 3.

Moreover, it is equally unclear why or how plaintiff was
prevented from timely exercising his rights afforded under
available state election statutes while his appeal was pending
before the Second Circuit. The Second Circuit has ruled
decisively that available state statutory remedies preclude
federal challenges about election results. Rivera-Powell v. New
York City Bd. of Elec., 470 F.3d 458, 467-68 (2d Cir. 2006); see
also Minnus v. Board of Elections in City of New York, 2010 WL
3528544, *4 (E.D.N.Y. Sep. 3, 2010) (Townes, D.J.) (when a
candidate "was not deprived of an opportunity to be heard, [but]
rather she chose not to avail herself of the process, [she]
cannot now inappropriately bring an action in federal court").

The same result should follow here. Because plaintiff
failed to avail himself of available state court remedies
following the November 2010 gubernatorial election, he is unable
to demonstrate a clear or substantial likelihood of success on

- 16 -

the merits for federal court intervention a year and a half
later.

### 6. There Is No Clear Or Substantial Likelihood Of Success On A Claim Of Religious Discrimination.

Plaintiff alleges no clear or substantial likelihood of
success on a claim of religious discrimination, since the word
"Damn" *was* on the ballot in 2010.

As in the past, plaintiff asserts:

> There is strong reason and reasonable doubt
> to believe the New York State Board of
> Elections Officials with their Religious
> beliefs will try all and everything in there
> power to block/prevent this [plaintiff's
> aspirational electoral success] from
> happening.

Memorandum ¶ 1 (Appendix B); complaint ¶ 4 (Appendix A) ("The
argument [in the Second Circuit] was because of the New York
State Board of Elections Officials Religious beliefs the word
DAMN was not allowed to appear on the New York State Ballot . .
. .").

However, it is undisputable that plaintiff appeared on the
2010 gubernatorial ballot under the rubric "The Rent Is 2 Damn
High Party." That basic fact vitiates any possible claim of
clear or substantial likelihood of success on any religious
discrimination claim.

Therefore, plaintiff alleges no claim evincing a clear or
substantial likelihood of success with respect to the 2010

gubernatorial election, on any ground, and his application
should be denied in its entirety.

**B. Plaintiff Has Failed To Demonstrate
The Likelihood Of Irreparable Harm
In The Absence Of A Mandatory Injunction.**

As the Second Circuit held in Salinger, "courts must not
simply presume irreparable harm." 607 F.3d at 82 (citing eBay,
547 U.S. at 393). "Rather, plaintiffs must show that, on the
facts of their case, the failure to issue an injunction would
actually cause irreparable harm." Id.

Since plaintiff does not allege, much less adduce,
any proof that a second recanvass would change the results
of the election, see www.elections.ny.gov/NYSBOE/elections/2010,
he has failed to demonstrate "that irreparable injury is
*likely* in the absence of an injunction." Salinger, id. at
79 (emphasis original) (quoting Winter, 555 U.S. at 22)).
See Grand River Enterprise Six Nations, Ltd. v. Pryor, 481
F.3d 60, 66 (2d Cir. 2007) ("To satisfy the irreparable
harm requirement, plaintiffs must demonstrate that absent a
preliminary injunction they will suffer an injury that is
neither remote nor speculative, but actual and imminent,
and one that cannot be remedied if a court waits until the
end of trial to resolve the harm.") (citations and internal
quotation marks omitted).

Plaintiff's request for a mandatory injunction ordering a second recanvass, without any support demonstrating *likely* irreparable injury in the absence of such an extraordinary statewide undertaking, fails to meet the standard for the judicial intervention he seeks.

**C.  The Balance Of Hardships Favors The State
    Because The Public Interest Would Be Disserved
    By The Issuance Of A Preliminary Injunction.**

The balance of hardships favors the State, particularly since "the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." Salinger, id. at 80 (quoting eBay, 547 at 391)).

As explained above, *all* 4,763,688 votes cast in the 2010 gubernatorial election are on paper. See Svizzero decl. ¶ 15.

To hand recanvass nearly five million paper ballots would be a tremendous burden and expense for the local boards and inappropriately interfere with their vital activities to prepare for at least four, and in some instances five, separate elections between now and November: (1) special elections in March, (2) the presidential primary in April, (3) the congressional primary in June, (4) the state legislative primary in September, and (5) the general election in November. See Svizzero decl. ¶ 15.

Indeed, the local boards are already heavily engaged in preparations for the presidential primary. Under the political

calendar applicable to that election, which is published at
http://www.elections.ny.gov/NYSBOE/elections/2012/Primary/2012Pr
esPrimaryCalendar01092012.pdf, designating petitions were
required to be filed, pursuant to N.Y. Election Law § 6-
158(1)(a), between February 6 and February 9. The political
calendar evidences that the local boards are busy administering
the presidential primary and will continue to be engaged in such
administration well into May, while simultaneously preparing for
the congressional primary ordered by the district court for
Northern District of New York to be held on June 26. In
addition, boards are also simultaneously preparing for five
special elections for the Legislature on March 20. See
http://www.elections.ny.gov/NYSBOE/elections/2012/Special/MultiO
fficeSpecialCalendar03202012.pdf.

Under the circumstances, ordering a second recanvass now
would plainly disserve the public interest, and plaintiff's
application should be denied in its entirety for that additional
reason.

## Conclusion

THE APPLICATION SHOULD BE
DENIED IN ITS ENTIRETY.

Dated:    New York, New York
          February 21, 2012

                          Respectfully,

                          ERIC T. SCHNEIDERMAN
                          Attorney General of the
                            State of New York
                          **Attorney for Defendant**

                          By:

                          JOEL GRABER
                          Special Litigation Counsel
                          Litigation Bureau
                          120 Broadway – 24th Floor
                          New York, NY 10271-0332
                          (212) 416-8645
                          FAX (212) 416-6009
                          Joel.Graber@ag.ny.gov

LITIGATION BUREAU:

JOEL GRABER
Special Litigation Counsel
  of Counsel

**CERTIFICATE OF SERVICE**

JOEL GRABER, an attorney duly admitted to practice in the

State of New York and before this Court, certifies under penalty

of perjury that on February 21, 2012, he caused the within

MEMORANDUM OF LAW AND APPENDICES to be served upon the following

plaintiff *pro se*:

*VIA EXPRESS MAIL/OVERNIGHT DELIVERY:*

James E. McMillan III
1996 Nostrand Ave.
Brooklyn, NY 11210-1547

*AND VIA E-MAIL:*

rentisto@aol.com

Dated:    New York, New York
          February 21, 2012

JOEL GRABER
Special Litigation Counsel
State of New York

## CITED WESTLAW CASES

<u>McMillan v. N.Y. State Bd. of Elections</u>
E.D.N.Y. 2012 Civ. 302 (JG) (VVP)

<u>McMillan v. N.Y. State Bd. of Elections</u>, 2010 WL 2607272 (E.D.N.Y. Jun. 25, 2010) (Gleeson, D.J.).

<u>McMillan v. New York State Bd. of Elections</u>, 2010 WL 4065434 (E.D.N.Y. Oct. 10, 2010) (Gleeson, D.J.)

<u>McMillan v. New York State Bd. of Elections</u>, 2011 WL 6061356 (2d Cir. Dec. 7, 2011).

Westlaw.

Slip Copy, 2010 WL 2607272 (E.D.N.Y.)
**(Cite as: 2010 WL 2607272 (E.D.N.Y.))**
**H**
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.
James E. McMILLAN III, Plaintiff,

v.

NEW YORK STATE BOARD OF ELECTIONS and New York City Board of Elections, Defendants.

No. 10-CV-2502 (JG)(VVP).
June 25, 2010.

James E. McMillan, III, Brooklyn, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New York, by: Joel Graber, New York, NY, for Defendant the New York State Board of Elections.

Michael Cardozo, Corporation Counsel for the City of New York, by: Stephen Kitzinger, New York, NY, for Defendant the New York City Board of Elections.

*ORDER*

JOHN GLEESON, District Judge.

*1 Plaintiff James E. "Jimmy" McMillan III is the founder and leader of the Rent is Too Damn High Party. As one might glean from the party's name, McMillan and his colleagues focus their political energies on the allegedly excessive amounts that landlords charge residential tenants. McMillan has successfully petitioned for ballot access on three occasions, running for Governor of New York in 2006 and for Mayor of New York City in 2005 and 2009. He was ultimately defeated at the polls by Eliot Spitzer (in 2006) and Michael Bloomberg (in 2005 and 2009).

This case arises from McMillan's insistence that the party's emphatic name should appear on the ballot in its entirety. Though the full name appeared on the 2005 mayoral ballot, the word "Damn" was excised by the electoral authorities on the 2006 gubernatorial ballot and the 2009 mayoral ballot. McMillan contends that the abbreviated name-"Rent is Too High"-weakens his message and leads to voter confusion. Moreover, McMillan alleges that the word "Damn" was removed for religious reasons, and asserts that its elimination violates the First Amendment's Free Speech and Establishment Clauses. The complaint seeks damages of $50 million, and also requests permanent injunctive relief that would guarantee "Rent is Too Damn High" a place on all future ballots.

The defendants-the New York State and City Boards of Elections-made the decisions to edit the party name in 2006 and 2009. They deny any religious motive, and say that "Rent is Too Damn High" is simply too long for the ballot. Defendants point to the provisions of the Electoral Code that permit abbreviation of party names containing more than fifteen letters "whenever limitations of space so require." *See* N.Y. Elec. Law § 7-104(2) (electronic voting machines); *id.* § 7-106(10) (paper ballots). "Rent is Too Damn High" contains seventeen letters; defendants assert that they chose the thirteen-letter "Rent is Too High" because, in their view, it was the least intrusive abbreviation that would fit, and because McMillan provided no alternative suggestion.

McMillan is running for Governor of New York again this year. When he filed this action, he also moved by order to show cause for a preliminary injunction requiring the defendants to allow "Rent is Too Damn High" on the general election ballot in November.<sup>FN1</sup> At oral argument on the motion, however, McMillan and the defendants were able to reach a mutually acceptable middle ground between "Rent is Too Damn High" and "Rent is Too High." They agree that a different abbreviation-"Rent is 2 Damn High"-would accommodate both sides' concerns. This fifteen-character name is not subject to abbreviation under the electoral laws. Most importantly for McMillan, it preserves the intensifying force of the word "Damn."

    FN1. McMillan is also pursuing the Democratic Partyks nomination for Governor.

By agreeing to this compromise position, McMillan mooted his request for preliminary injunctive relief requiring the full, seventeen-character version of the party's name. The agreement removes any dispute with regard to the forthcoming election. Accordingly, the motion for a preliminary injunction is denied as moot.

    **\*2** So ordered.

E.D.N.Y.,2010.
McMillan v. New York State Bd. of Elections
Slip Copy, 2010 WL 2607272 (E.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Slip Copy, 2010 WL 4065434 (E.D.N.Y.)
(Cite as: 2010 WL 4065434 (E.D.N.Y.))
**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
James E. McMILLAN III, Plaintiff,

v.

NEW YORK STATE BOARD OF ELECTIONS and New York City Board of Elections, Defendants.

No. 10-CV-2502 (JG)(VVP).
Oct. 15, 2010.

James E. Mcmillan, III, Brooklyn, NY, pro se.

Andrew M. Cuomo. Attorney General of the State of New York, by: Joel Graber, New York, NY, for Defendant the New York State Board of Elections.

Michael Cardozo, Corporation Counsel for the City of New York, by: Stephen Kitzinger, New York, NY, for Defendant the New York City Board of Elections.

*MEMORANDUM AND ORDER*

JOHN GLEESON, District Judge.

**\*1** Plaintiff James E. "Jimmy" McMillan III brings this action, *pro se,* against the New York State Board of Elections ("State Board") and the Board of Elections in the City of New York ("City Board") pursuant to 42 U.S.C. § 1983, seeking both monetary and injunctive relief. The State Board moves to dismiss the complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, pursuant to Rule 12(b)(6) for failure to state a claim. The City Board moves to dismiss pursuant to Rule 12(b)(6) for failure to state a claim. For the reasons stated below, the State Board's motion to dismiss is granted. The City Board's motion to dismiss is granted with respect to claims for damages accruing prior to June 2, 2007. With respect to all remaining claims for damages, the City Board's motion to dismiss is treated as a motion for summary judgment under Rule 56 and is granted. Finally, the City Board's motion to dismiss is granted with respect to McMillan's claim for permanent injunctive relief.

BACKGROUND

McMillan is the founder and leader of the Rent is Too Damn High party. In 2005 and 2009, McMillan ran for Mayor of New York City, and in 2006, he ran for Governor of New York State. In 2005, his party's full name appeared on the mayoral ballot, but electoral authorities subsequently removed the word "Damn" from the party's name, listing McMillan as a candidate for the "Rent is Too High" party on the 2006 gubernatorial and 2009 mayoral ballots.

McMillan brings this *pro se* action under 42 U.S.C. § 1983 against the State and City Boards, alleging that elimination of the word "Damn" from his party's name in 2006 and 2009 constituted a violation of his federal constitutional rights. Defendants maintain that the party name was altered because the seventeen letters in "Rent is Too Damn High" made it too long to fit on the ballot. They point to provisions of the New York Election Law that authorize abbreviation of party names containing more than fifteen letters "whenever limitations of space so require." *See* N.Y. Elec. Law § 7-104(2) (electronic voting machines); *id.* § 7-106(10) (paper ballots). McMillan, however, asserts that the word "Damn" was excised from the party name for religious reasons. He further alleges that the defendants permitted the names of other parties containing more than fifteen letters to be printed on the ballot, and that elimination of the word "Damn" from his own party's name was arbitrary and discriminatory.

McMillan filed his initial complaint on June 2, 2010, seeking damages of $50 million as well as a permanent injunction granting the "Rent is Too Damn High" party a guaranteed appearance on all future statewide ballots. McMillan attached a number of exhibits to his initial complaint. Also on June 2, McMillan moved for a preliminary injunction requiring defendants to include the "Rent is Too Damn High" party on the general election ballot in November of this year. In response to an order to show cause why the requested preliminary injunctive relief should not be granted, the State Board submitted both a memorandum of law and an affidavit. Similarly, the City Board submitted a memorandum and affidavit, along with several exhibits. At oral argument on June 16, 2010, McMillan provided the Court with still further exhibits that pertained both to the claims asserted in his complaint and to his request for a preliminary injunction.

**\*2** Following oral argument, I denied McMillan's motion as moot, as the parties had settled upon a mutually agreeable abbreviation of the party's name-"Rent is 2 Damn High"-to be printed on the November ballot should McMillan succeed in collecting the required number of signatures for an independent nomination under New York's election law.[FN1] *McMillan v. New York State Bd. of Elections,* No. 10-CV-2502 (JG)(VVP), 2010 WL 2607272, at \*1 (E.D.N.Y. June 25, 2010).

> FN1. On July 1 July 6 and July 13 McMillan renewed his request for preliminary injunctive relief by filing four letter briefs, two of which attached exhibits. McMillan sought an injunction obliging the defendants to allow "Rent is 2 Damn High" an appearance on the November ballot regardless of whether he satisfied the state's qualification requirements. At the time of his requests, McMillan had not yet produced a petition with sufficient valid signatures to qualify. Accordingly, on July 14, 2010, I denied his repeated requests for interim relief, explaining that McMillan had offered no justification for an order allowing him to bypass the petition process. On July 19, McMillan filed a motion, with exhibits attached, asking the Court to reconsider its July 14 order. I denied this motion on July 20. McMillan then asked the Court on August 26 to clarify the July 14 order. I responded on August 27 with an order explaining, again, that the parties had agreed that "Rent is 2 Damn High" is an appropriate way for the party name to appear on the ballot. I further explained that this resolution of the preliminary injunction motion did not bear on McMillan's claims for damages based on past conduct.

> Since that time, McMillan appears to have satisfied the requirements for appearing on the general election ballot. As represented to the Court by the State Board at oral argument on September 10, McMillan is expected to appear on the November ballot as a candidate for governor on behalf of the "Rent is 2 Damn High" party. *See* Transcript of Proceedings on September 10, 2010 at 6-7 ("Sept. 10 Trans.").

Meanwhile, on July 1, McMillan filed an amended complaint, seeking $350 million in damages and a permanent injunction requiring defendants to include "Rent is 2 Damn High" on all future ballots. Additional exhibits were attached to the amended complaint. On July 19, the City Board filed a motion to dismiss for failure to state a claim. Along with its notice of motion, the

City Board filed a notice to McMillan explaining that written materials outside the pleadings had been submitted to the Court, alerting him that the Court might treat the motion to dismiss as a motion for summary judgment, and encouraging him to submit affidavits and other documentary evidence in support of his claims. Claiming sovereign immunity, the State Board moved on July 21, 2010 to dismiss McMillan's amended complaint for lack of jurisdiction or, in the alternative, failure to state a claim. Again, the State Board submitted with its motion an affidavit and a number of exhibits.

Oral argument was held on the motions to dismiss on September 10, 2010. I informed the parties that, given the number of exhibits and affidavits that had been submitted, I was inclined to treat portions of the defendants' motions as motions for summary judgment. I invited the parties to bring to my attention any facts or evidence relevant to the motions that they believed I did not have before me.

## DISCUSSION

### A. *Liberal Construction of a* Pro Se *Plaintiff's Submissions*

Where a plaintiff proceeds pro se, the court must liberally construe his submissions on "the understanding that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)) (alteration in original). In construing McMillan's submissions, I therefore "interpret them 'to raise the strongest arguments that they suggest.' " *See McPherson v. Coombe,* 174 F .3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

### B. *The State Board's 12(b)(1) Motion to Dismiss*

#### 1. *Legal Standard*

The State Board moves for dismissal pursuant to Fed.R.Civ.P. 12(b)(1), alleging lack of subject matter jurisdiction in light of the Eleventh Amendment. A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks statutory or constitutional power to adjudicate it. *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1187 (2d Cir.1996). The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence. *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635 (2d Cir.2005). The court must construe all ambiguities and draw all inferences in favor of the plaintiff. *Marakova v. United States,* 201 F.3d 110, 113 (2d Cir.2000).

**\*3** The Second Circuit has held that an action is properly dismissed for lack of subject matter jurisdiction where a plaintiff's claims are barred by the Eleventh Amendment. *Madden v. Vermont Supreme Court,* 8 Fed. App'x 128, 129 (2d Cir.2001). More recently, the Second Circuit has stated in dicta that Eleventh Amendment immunity may not be a matter of subject matter jurisdiction governed by Fed.R .Civ.P. 12(b)(1) when raised in a motion to dismiss, and might be more properly treated as a challenge to the legal sufficiency of the complaint under Fed.R.Civ.P. 12(b)(6). *State Employees Bargaining Agent Coalition v. Rowland,* 494 F.3d 71, 77 n. 4 (2d Cir.2007) (citing *Wisc. Dep't of Corr. V. Schacht,* 524 U.S. 381 (1998)). Without resolving the issue, the court noted that the distinction is significant in one respect: "while we must accept all factual allegations in a complaint as true when adjudicating a motion to dismiss under Fed.R.Civ.P. 12(b)(6) ... in adjudicating a motion to dismiss for lack of subject-matter jurisdiction, a district court may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits ." *Id.* (citations omitted). This distinction does not affect the outcome here; in evaluating the State Board's assertion of sovereign immunity, I look only to the pleadings and to state and federal law.

*2. Eleventh Amendment Immunity*

McMillan's Section 1983 claims against the State Board are barred by the Eleventh Amendment and are therefore dismissed. *See Iwachiw v. New York City Bd. of Elections,* 217 F.Supp.2d 374, 379 (E.D.N.Y.2002) (dismissing § 1983 claims against the New York State Board of Elections on the basis of sovereign immunity), *aff'd,* 126 Fed. App'x. 27 (2d Cir.2005).

The State Board is a state agency for the purposes of the Eleventh Amendment.<sup>FN2</sup> *Id.* The Eleventh Amendment bars a suit for money damages or an injunction in federal court against such a state agency unless either Congress has clearly abrogated the state's immunity or the state has unequivocally waived its immunity. *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14. Section 1983 does not abrogate the sovereign immunity of the states, *Quern v. Jordan,* 440 U.S. 332, 342-43 (1979), and the state has not waived its immunity with respect to the claims asserted by McMillan, *see Edelman v. Jordan,* 415 U.S. 651, 673 (1974) ("[W]e will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.' " (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171 (1909)) (alteration in original)). Accordingly, the State Board's motion to dismiss is granted.

> FN2. A court considering whether a putative state entity is an arm of the state for the purposes of the Eleventh Amendment looks to state law to determine the entity's character. *Woods v. Rondout Valley Central School Dist. Bd. of Educ.,* 466 F.3d 232, 237 (2d Cir.2006). New York State law defines the State Board as an agency within the New York State executive department. N.Y. Elec. Law § 3-100(1). Furthermore, all four members of the State Board are appointed by the governor. N.Y. Elec. Law § 3-100(1). "That a majority of the Board's members are accountable to the statewide electorate-either directly or through the elected officials who appoint them-strongly indicates that the Board is a state agency .... " *Walker v. City of Waterbury,* 253 Fed. App'x. 58, 61 (2d Cir.2007).

C. *The City Board's 12(b)(6) Motion to Dismiss*

1. *Legal Standards*

a. *Rule 12(b)(6) Motion to Dismiss*

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Shomo v. City of New York,* 579 F.3d 176, 183 (2d Cir.2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). A claim is facially plausible only if the pleaded facts permit a court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.*

b. *Rule 12(d) Treatment of a Motion to Dismiss as a Motion for Summary Judgment*

**\*4** A motion to dismiss under Rule 12(b)(6) "presents a pure legal question, based on allegations contained within the four corners of the complaint." *Goldberg v. Danaher,* 599 F.3d 181, 183-84 (2d Cir.2010). When matters outside the pleadings are presented on a Rule 12(b)(6) motion, it is within the court's discretion either to exclude such matters or to treat the motion to dismiss as a motion for summary judgment under Rule 56. Fed.R.Civ.P. 12(d). *See also Gryga v. Ganzman,* 991 F.Supp. 105, 107 (E.D.N.Y.1998) (whether to treat a motion to dismiss as one for summary judgment upon presentation of matters outside the pleadings is a matter of discretion). When a motion to dismiss is converted into one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d). This requirement is satisfied where each party is given adequate notice that the motion to dismiss may be converted, and no party is taken by surprise. *In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir.1985), *cert. denied,* 475 U.S. 105 (1986).

c. *Rule 56 Motion for Summary Judgment*

A motion for summary judgment should be granted if the pleadings and documentary evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010). "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* When applying this standard, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *See Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir.2001).

2. *Statute of Limitations Applied to Claims Accruing Prior to June 2, 2007*

To the extent that McMillan's claims pertain to how the name of his party appeared on the 2006 gubernatorial ballot, they are barred by the applicable statute of limitations and are dismissed pursuant to Rule 12(b)(6). "The statute of limitations for claims brought under Section 1983 is governed by state law, and in this case is the three-year period for personal injury actions under New York State law." *Shomo,* 579 F.3d at 181 (2d Cir.2009) (citations omitted). *Accord Owens v. Okure,* 488 U.S. 235, 236 (1989). *See also Murawski v. Pataki,* 514 F.Supp.2d 577, 583 (S.D.N.Y.2007) (applying the three-year statute of limitations to claims challenging the validity of New York State election law and practices). Any claims accruing before June 2, 2007-three years before McMillan filed his complaint-are therefore time-barred. A claim brought under § 1983 accrues when the plaintiff knows of the alleged injury on which the claim is based. *Jaghory v. New York State Dept. of Educ.,* 131 F.3d 326, 331 (2d Cir.1997). Accordingly, McMillan can no longer make out a claim for injuries arising from the name used for his party on the November 2006 general election ballot. Therefore, with respect to all claims concerning the 2006 elections, the City Board's motion to dismiss is granted.

3. *Claims Accruing After June 2, 2007*

a. *Treatment of the Motion to Dismiss as a Motion for Summary Judgment*

**\*5** With respect to McMillan's remaining claims for damages, which pertain to the appearance of his party's name on the November 2009 ballot, I treat the City Board's motion to dismiss under Rule 12(b) (6) as a motion for summary judgment under Rule 56. *See* Fed.R.Civ.P. 12(d). Throughout the course of these proceedings, the parties have provided the Court with documentary evidence that provides a detailed depiction of the events surrounding elimination of the word "Damn" from McMillan's party's name on the 2009 general election ballot. Conversion to a motion for summary judgment is therefore appropriate. *See Thomson v. New York Cent. R. Co.,* 361 F.2d 137, 138-39 (2d Cir.1966) ("As every phase of the controversy was thoroughly explored in the affidavits in support and in opposition to the motion for a temporary injunction, and all the relevant documents were before the Court below, we think the motion to dismiss under Rule 12(b)(6) should have been treated as a motion for summary judgment."). Furthermore, the parties have had ample opportunity to present all material pertinent to the City Board's motion with respect to McMillan's claims concerning the 2009 election, *see* Fed.R.Civ.P. 12(d), and there is no indication that either party would submit additional relevant materials if given further opportunity. *See In re G. & A. Books, Inc.,* 770 F .2d at 295 ("The district court's conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form. The essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.").

There can be no question that the City Board has been aware, since its motion to dismiss was filed, that the Court might treat the motion as one for summary judgment. Indeed, the City Board attached to its notice of motion a statement addressed to

McMillan explaining that very possibility. Notice Mot. Dismiss at 2, July 19, 2010, ECF No. 25. By virtue of that statement, McMillan was also provided on July 19, 2010 with " 'unequivocal' notice of the meaning and consequences of conversion to summary judgment." *Hernandez v. Cofey,* 582 F.3d 303, 307-08 (3d Cir.2009) (quoting *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983)). Even prior to that notice, throughout these proceedings, McMillan has continually filed with the Court documentary evidence bearing on his claims against the City Board.

Nonetheless-fully aware that "[w]hen a party is proceeding *pro se,* notice is particularly important because the *pro se* litigant may be unaware of the consequences of his failure to offer evidence bearing on triable issues," *Wali v. Chelsea Plastics,* 351 Fed. App'x 547, 548 (2d Cir.2009) (internal quotation marks omitted)-I have ensured that McMillan has been afforded ample opportunity to identify additional facts and present additional material in opposition to the City Board's motion. At oral argument on the motions to dismiss, held on September 10, 2010, I informed the parties that I might treat the motions to dismiss as motions for summary judgment, at least in part. Sept. 10 Trans. at 2-3. I explained the differences between the two types of motion and informed McMillan that if there were any facts not before me that he wanted to bring to my attention, he should do so. *Id.* at 2-5, 28.

\*6 McMillan stated that he understood, *id.* at 3, and he responded to my invitation to identify additional evidence not yet in the record. At the September 10 oral argument, McMillan asked for production of several items: certain documents [FN3] as well as a copy of an audio recording of a meeting of the City Board commissioners held on October 6, 2009, at which McMillan appeared to discuss his objections to removal of the word "Damn" from his party's name.[FN4] *See* Sept. 10 Trans. at 21-22, 34-35. On September 13, 2010, I ordered the defendants to provide copies of the requested audiotape to McMillan and to the Court. The City Board complied on September 22. For reasons discussed fully below,[FN5] I did not order the defendants to comply with McMillan's remaining discovery requests, as none of the evidence he requested could plausibly have helped McMillan to establish a factual record in support of his claims.

> FN3. These requests were embodied in letters McMillan presented to the court, which he had sent to defendants on August 24, 2010. *See* Sept. 10 Trans. at 21-22. McMillan also filed copies of these letters on September 13. *See* Mot. Requesting Audiotape at 3, 6, Sept. 13, 2009, ECF No. 37 (attaching letters). In his August 24 letter to the State Board, McMillan asked for:

> Proof of Notification of (c2006) as required by New York State Election Law;

> (a) Pursuant to Election Law Section 6-134(2) 'Basis on Non-Compliance';

> (b) Pursuant to Election Law Section 6-138(3)(b) selecting a different name/emblem.

> (c) all other notices sent to Jimmy McMillan during the 2006 General Election.

> More specifically, McMillan sought:

> 1. Date notification(s) were sent

2. Conformation Number of Notifications if any

3. Form of delivery < example > (UPS) (Fed-Ex) or (Other ... )

In his August 24 letter to the City Board, McMillan requested:

1. Date: Absentee ballots were printed and received by the New York City Board of Elections send all proof.

2. Date: (1st) First Absentee ballots were mailed to Military and Voters.

3. AUDIO, Cassette or CD recording of Commissioners of Elections meeting held on Tuesday, October 6, 2009 at 1:30 P.M. @ Broadway, 6th Floor commissioner's room.

4. Documents that shows plaintiff attempt to change or reduce party name.

The requests made in these letters echoed one made in a motion that McMillan filed on July 19, 2010, asking the court to "ORDER the defendant(s) to send to the Court all 'NOTIFICATIONS' sent to Plaintiff JIMMY McMILLAN what gave them the right under Section (6-138(b) New York State Election Law [sic] to removal of the word 'DAMN' from the Rent Is Too Damn High party name in the (c2006) Gubernatorial Election." Mot. Requesting Notifications, July 19, 2010, ECF No. 23.

FN4. McMillan renewed this request in a letter to the Court filed on September 13, 2010. *See* Mot. Requesting Audiotape, at 1.

FN5. *See infra* at notes 8-10.

Based on my invitation to McMillan on September 10 to inform me of all evidence not yet before me, and his affirmation that he understood my statements, *see* Sept. 10 Trans. at 2-3, I conclude that the discovery requests articulated at oral argument reflect the full extent of discovery that McMillan wishes to seek in this case. Accordingly, converting portions of the City Board's motion to dismiss into a motion for summary judgment will not take the parties by surprise or deprive them of an opportunity to present facts not already before the Court.

### b. *The Alleged Constitutional Violations*

Liberally construed, McMillan's allegations regarding the appearance of his party's name on the 2009 general election ballot can be read to make out claims under the First and Fourteenth Amendments of the United States Constitution. [FN6] With respect to each of these claims, the City Board's motion for summary judgment is granted.

FN6. In his opposition to the defendants' motions to dismiss, McMillan for the first time makes reference to the New York State Constitution. Because McMillan's complaint and amended complaint provide no hint of state law causes of

action, claims alleging violations of state law are not timely made. Even if they had been timely made, there appear to be insufficient differences between the cited New York State constitutional provisions and their federal counterparts to salvage the state claims where McMillan's federal constitutional claims fail.

i. *Fourteenth Amendment Equal Protection*

McMillan alleges that the City Board intentionally and arbitrarily treated him differently from other similarly-situated candidates. These allegations suggest a claim under the Equal Protection Clause of the Fourteenth Amendment. Courts "have recognized successful equal protection claims brought by a 'class of one' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564-65 (2000). In his amended complaint, McMillan alleges that "the defendant(s) admitted to deliberately allowing selective political parties to appear on the ballot with more than (15) fifteen characters in clear violation of New York State Elections Law (7-104(2)[sic]. At the same time they took 'DAMN' out the 'Rent is too damn high' party name and that is a Deprivation of Rights. I was 'Deprived' from having, and 'Discriminated' against." Am. Compl. at 1, July 1, 2010, ECF No. 18.

In order to prevail on a "class of one" theory of discrimination, McMillan must show at a minimum: (1) that he was treated differently from other similarly situated individuals, and (2) "either that there was no rational basis for the unequal treatment received, or that the denial of the application was motivated by animus." *Harlen Assocs. v. Incorporated Village of Mineola,* 273 F.3d 494, 499-500 (2d Cir.2001). Additionally, McMillan must establish that any differential treatment was not only arbitrary, but intentional. *Giordano v. City of New York,* 274 F .3d 740, 742-43 (2d Cir.2001).[FN7]

> FN7. Plaintiffs in the Second Circuit asserting claims of selective enforcement "traditionally have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such different treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Harlen Assocs.,* 273 F.3d at 499 (quoting *LaTrieste Rest. & Cabaret v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994)). However, the Supreme Court's decision in *Olech,* 528 U.S. 562, called into question whether a plaintiff alleging an equal-protection violation must show an illicit motivation, or simply intentional and arbitrary disparate treatment. *See Hayut v. State University of New York,* 352 F.3d 733, 74 n. 15 (2d Cir.2003). The Second Circuit has repeatedly declined to resolve this question. *Id.* This ambiguity in circuit law does not affect the analysis in this case because McMillan cannot establish that he was treated differently from other similarly situated individuals.

**\*7** The documentary evidence establishes as a matter of law that McMillan was treated no differently from other similarly situated individuals with respect to the 2009 general election ballot. The evidence further makes plain that, far from acting arbitrarily, the City Board acted rationally and systematically to shorten all party names exceeding fifteen letters due to space restrictions on the mayoral ballot. No party names exceeding fifteen characters were printed on the 2009 ballot. *See* Richman Decl., Ex. B, June 10, 2010, ECF No. 12 (image of the 2009 ballot). In addition, at least two other parties with names that originally exceeded fifteen characters appeared on the 2009 ballot in abbreviated form.[FN8] Furthermore, on multiple occasions, McMillan received notice similar to the notice provided other candidates that his party's name was too long, and he was given the same opportunity as other candidates to indicate a preferred shortened version. The record includes copies of letters the City Board sent on September 11, 2009 to three candidates, including McMillan, advising them that their party names were too long and inviting them to submit shortened versions by September 18, 2009. *Id.,* Ex. A. McMillan himself has submitted an additional letter to the same effect, sent to him by the City Board on August 21, 2009, which also invited submission of a shortened version of the party's name within seven days. *Am. Compl.* at 8-9 (attaching letter).[FN9]

FN8. McMillan identifies three parties with names containing more than fifteen letters: the "For Socialism and Liberation" party, the "Socialist Workers" party, and the "Jobs and Education" party. An affidavit filed by the City Board explains that the names of two of these parties were abbreviated on the ballot to "Socialism & Lib" and "Socialist Worker," which contain thirteen and fifteen characters, respectively. Richman Decl. at para 8. As for the "Jobs and Education" party, all petitions were filed using the name "Jobs & Education," which is fifteen characters long and therefore did not require abbreviation. *Id.* at para. 4 n. 1. An image of the 2009 ballot, which includes "Socialism & Lib" and "Socialist Worker" alongside "Rent Is Too High," is consistent with this account. *See id.,* Ex. B.

FN9. One of McMillan's discovery requests, which I did not grant, asked the State and City Boards to provide proof of notification sent to McMillan of the Boards' authority to abbreviate his party's names. *See* Mot. Requesting Notifications; Mot. Requesting Audiotape at 3, 6 (attaching Aug. 26, 2010 letters to defendants requesting production of documents). I decide this motion without granting these requests because they could only produce further evidence that McMillan was provided both with notice that his party's name was subject to abbreviation and with an opportunity to create his own abbreviation. Any additional notice given to McMillan would undermine rather than support his claims.

McMillan did not avail himself of the opportunity twice afforded by the City Board to select a party name of no more than fifteen letters. *See* Richman Decl. at para. 7 ("Mr. McMillan did not contact the Board of Elections to express a preference as to how the name of the Rent is Too Damn High Party should be shortened."). McMillan responded to the City Board's August 21, 2009 letter by informing the City Board on August 24 that he had selected the unabbreviated, unaltered name "Rent is too damn high." *See* Am. Compl. at 11 (attaching letter). McMillan sent no response at all to the City Board's September 11 letter within the allotted seven days. It wasn't until October 5, 2009, long after the deadlines set out in the City Board's letters had passed, that McMillan attempted to select "Rent Is 2 Damn High" as an abbreviated party name for appearance on the November 2009 ballot.[FN10] *See* Letter Seeking Prelim. Injunction, at 4-6, July 1, 2010, ECF No. 17 (attaching Oct. 5, 2009 letter and certificate selecting "Rent Is 2 Damn High" as party name). Once McMillan missed the August 28, 2009 and then the September 18, 2009 deadlines for submitting an abbreviated version of his party's name, the City Board reasonably exercised its authority pursuant to N.Y. Elec. Law § 7-104(2) and created for the ballot its own logically shortened version.[FN11]

FN10. Another of McMillan's discovery requests asked the City Board to produce "Documents that shows [sic] plaintiff attempt to change or reduce party name." *See* Mot. Seeking Discovery of Audio Tape at 6. I did not grant the request because McMillan would be aware of any attempt he made to shorten his party's name before the September 28, 2009 deadline, and by his own account he made none. Indeed, McMillan has identified October 5, 2009 as the date on which he attempted to abbreviate his party's name. *See* Sept. 10 Trans. at 23 (offering the Court an October 5, 2009 letter while explaining, "So, I agreed to change the name to 2.... They said it was too late."); Audiotape of Oct. 6, 2009 Commissioners' Meeting, Side B at 5:22-5:47, 8:42-8:51, Sept. 27, 201, ECF No. 40 ("Audiotape") (indicating that Oct. 5, 2009 was the first time that McMillan offered an abbreviated version of the party name). McMillan has explained that after receiving the September 11, 2009 letter from the City Board stating that his party's name was too long, he visited the City Board's Candidate Records Unit instead of calling the City Board or submitting a letter with an abbreviated version; while at the Candidate Records Unit, he also did not offer an abbreviated version. *See* Sept. 10 Trans. at 16-17, 22-23, 30; Audiotape, Side B at 3:58-4:41, 6:45-7:10, 8:42-8:51, 12:13-12:18, Sept. 27, 201, ECF No. 40 ("Audiotape") (McMillan stating he did not believe at the time he visited the Candidate Records Unit that his party's name needed to be abbreviated). *See also* Sept. 10 Trans. at 18 (clarifying that what McMillan refers to as the Candidate Services Unit is the Candidate Records Unit).

A letter sent by McMillan to the City Board, dated September 28, 2009, confirms that even at that time-ten days after the City Board's deadline-McMillan had still not offered an abbreviated version of his party's name. *See* Compl. at 9, June 2, 2010, ECF No. 1 (attaching letter). McMillan sent the letter after receiving from the City Board a tentative list of candidates expected to appear on the November ballot, which identified McMillan's party as "Rent Is Too High." *See* Am. Compl. at 24 (attaching tentative candidacy list). In his letter, McMillan demanded to know why the word "Damn" had been taken out of his party's name. *See* Compl. at 9. He cited the provision of the New York Election Law that permits the Board to abbreviate names longer than fifteen letters, but he did not then offer an abbreviated version, and he did not claim to have offered a shorter version at any time prior. Instead, McMillan challenged the City Board's determination that the name was too long and questioned whether its length was the true reason for its abbreviation. *Id.* (" 'The Rent Is Too Damn High Party' made it on the ballot in 2005 in it's [sic] entirely. Why is there a problem now (in 2009) when you are using the same voting machines? ... If it is the word 'DAMN' is getting the Commissioner's [sic] at the NYC Board of Elections upset for 'religious reasons' then the Commissioner's objection and modification is unconstitutional ....").

In light of the evidence before the court and McMillan's own statements concerning the events of 2009, it is clear that McMillan's request for production of documents evidencing his own attempts to shorten his party's name would not uncover any additional facts in support of McMillan's claims.

FN11. It has also been suggested by the City Board that, by the time McMillan made his October 5 proposal to shorten his party's name to "Rent Is 2 Damn High," absentee and military ballots had been printed, and the ballot had been certified. *See* Sept. 10 Trans. at 9-10. The evidence in the record tends to support this contention. For instance, at the October 6, 2009 meeting of the commissioners attended by McMillan, the commissioners stated that absentee, military, standby, and emergency ballots had been printed, and that changing those ballots would cost hundreds of thousands of dollars. *See* Audiotape at 170-194. McMillan seems to question these assertions and has included among his discovery requests proof of the dates on which absentee and military ballots were printed and mailed. *See* Mot. Requesting Audiotape at 6. I did not grant this request before deciding the present motion. The reasonableness of the City Board's position would only be enhanced by evidence showing that the Board would have incurred exorbitant costs had it adopted McMillan's proposed abbreviation as late as October 5, 2009. On the other hand, evidence showing that no ballots had yet been printed would provide no factual basis for concluding that McMillan's equal protection rights had been violated. October 5, 2009 was long past the September 18 deadline set by the City Board for McMillan to offer an abbreviated party name. McMillan has made no allegations that this deadline was applied to him arbitrarily, or that it was disregarded with respect to other similarly situated individuals.

In light of this evidence, no reasonable inference can be drawn that McMillan was treated differently from other similarly situated individuals, or that he was treated arbitrarily.[FN12] Accordingly, the City Board's motion for summary judgment with respect to McMillan's "class of one" equal protection claim is granted.

FN12. At most, the record suggests that the actions taken by the City Board in the months leading up to the November 2009 election caused some confusion, as McMillan was sent multiple letters on the same day identifying multiple problems with his party's name, or because the Candidate Records Unit did not provide McMillan with clear guidance about how to resolve the problems. *See, e.g.,* June 16 Trans. at 9; Sept. 10 Trans. at 30-33; Audiotape, side B at 17:11-19:32, 23:41-24:19 (McMillan argues, and at least one commissioner agrees, that State Board's methods were sloppy and likely created confusion). However, the record shows that the Board did provide McMillan with notice and multiple opportunities to cure before excising the word "Damn." The record further establishes that such notice

was provided in unequivocal if not crystal-clear terms, and that it was at least the same notice as was afforded to other candidates. Proof that the City Board was sloppy or confusing in its methods does not amount to proof that it violated McMillan's constitutional rights.

ii. *Fourteenth Amendment Due Process*

*8 McMillan's assertion of arbitrary treatment might conceivably be read also to allege a violation of procedural due process. Even if such a claim can be found in McMillan's complaint, it does not survive summary judgment. McMillan has neither alleged nor established a liberty or property interest secured by the Due Process Clause. An individual has no property or liberty interest in an elected office. *See Snowden v. Hughes,* 321 U.S. 1 (1944). Nor does he have such an interest in being elected, *Emanuele v. Town of Greeneville,* 143 F.Supp.2d 325, 333 (S.D.N.Y.2001), or in appearing on a ballot, *Douglas v. Niagara County Bd. of Elections,* 2007 WL 3036809, at *4 (W.D.N.Y.2007); *Cornett v. Sheldon,* 894 F.Supp. 715, 725 (S.D.N.Y.1995). Accordingly, McMillan cannot succeed on a due process claim where the only injury alleged is a thwarted opportunity to be elected.

In any event, even if McMillan had identified a cognizable injury for purposes of a due process claim, the evidence establishes as a matter of law that McMillan was afforded due process. Three factors must be balanced in order to determine whether a plaintiff was afforded due process:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews v. Eldridge,* 424 U.S. 319, 335 (1976). Under the *Matthews* test, McMillan was afforded adequate procedures before the City Board abbreviated his party's name on the 2009 general election ballot.

First, although McMillan has repeatedly claimed that, by removing the word "Damn" from his party's name, the City Board took his party's name off the ballot completely, *see, e.g.* Sept. 10 Trans. at 25; Transcript of Proceedings on June 16, 2000 at 26-27 ("June 16 Trans."), that is simply not the case. The deprivation complained of is that McMillan's party's name appeared on the ballot in a form that was abbreviated and diluted, recognizable as the same party but not to McMillan's liking. Even if this alleged deprivation constituted a cognizable injury under the Due Process Clause, it is certainly not as severe as removal from the ballot entirely. Second, the evidence establishes that McMillan was provided with notice that his party's name was subject to abbreviation by the City Board and an opportunity to provide his own abbreviation. *See* Am. Compl. at 8-9 (letter dated Aug. 21, 2009 informing McMillan that his party name was too long and notifying him that if he did not file an abbreviated form within seven days, the City Board would select a name); Richman Decl., Ex. A (letter dated Sept. 11, 2009 to the same effect). In addition, New York state law provides for full judicial review in expedited proceedings for any aggrieved candidate wishing to challenge the appearance of a party name on a ballot. N.Y. Elec. Law § 16-104. Although McMillan did not pursue such a remedy, its availability, along with the notice and opportunity to cure provided by the City Board prior to the alleged deprivation, satisfies due process. *See Rivera-Powell v. New York City Bd. of Elections,* 470 F.3d 458, 466-67 (2d Cir.2006) (finding due process satisfied where plaintiff's party was removed entirely from the ballot, where plaintiff was provided notice and an opportunity to be heard before removal and an opportunity to obtain expedited state judicial review of the removal decision).

*9 Finally, "it is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and

ballots to reduce election-and campaign-related disorder." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997). *See also Burdick v. Takushi,* 504 U.S. 428, 433 (1992) ("Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.' " (quoting *Storer v. Brown.* 415 U.S. 724, 730 (1974))).

In light of these factors, even if McMillan had alleged violation of an interest protected by the Due Process Clause, there can be no doubt as a matter of law that McMillan was afforded due process of law. Accordingly, the City Board's motion for summary judgment is granted with respect to any due process claim asserted by McMillan.

### iii. *First Amendment Religious Freedom*

In his amended complaint, McMillan alleges that the City Board was "guilty of endorsing [its] Religious Beliefs" when it removed the word "Damn" from his party's name on the 2009 ballot. On the basis of this allegation, McMillan asserts a claim under the Establishment Clause of the First Amendment. [FN13] The Establishment Clause "prohibits government from preferring one religious denomination over another." *Skoros v. City of New York,* 437 F.3d 1, 16 (2d Cir.2006) (citing *Larson v. Valente,* 456 U.S. 228, 244 (1982)). There is no genuine issue of material fact on this issue, and there is no evidence from which a rational factfinder could conclude that the City Board acted contrary to this prohibition. [FN14] Beyond a bare allegation that the City Board was motivated by religion, McMillan offers no evidence that the City Board's actions reflected a religious preference. [FN15] On the other hand, as discussed above, ample evidence establishes that the City Board acted with a purely secular motive and effect: to accommodate space limitations on the ballot pursuant to its authority under New York electoral law. *See* N.Y. Elec. Law § 7-104(2), § 7-106(10). The City Board's ready agreement on June 16 to a "Rent Is 2 Damn High" abbreviation further undermines McMillan's claim that the Board was motivated by a religious animus last year. Accordingly, the City Board's motion for summary judgment is granted with respect to McMillan's Establishment Clause claim.

> FN13. In its June 10, 2010 memorandum in opposition to McMillan's motion for a preliminary injunction, the State Board treated McMillan's original complaint as having asserted a violation of his Free Exercise rights. McMillan's submissions cannot plausibly be read to assert a claim under the Free Exercise Clause. However, even if McMillan had asserted such a claim, it would be entirely unsupported and could not reasonably be resolved in his favor. The Free Exercise Clause protects individuals from "government compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion." *Mozert v. Hawkins County Bd. of Educ.,* 827 F.2d 1058 (6th Cir.1987). "Hence it is necessary in a free exercise case for one to show the coercive effect of [government action] as it operates against him in the practice of his religion." *Abington School District v. Schempp,* 374 U.S. 203, 223 (1963). McMillan has alleged no such coercion, and he has provided evidence of none.

> FN14. The City Board contends that I need not reach this question, because all of McMillan's First Amendment claims fail as a matter of law once his due process claim has been resolved against him. The City Board relies on the Second Circuit's statement in *Rivera-Powell,* 470 F.3d at 469, that where "a plaintiff challenges a Board of Election[s] decision not as stemming from a constitutionally or statutorily invalid law or regulation, but rather as contravening a law or regulation whose validity the plaintiff does not contest, there is no independent burden on First Amendment rights when the state provides adequate procedures by which to remedy the alleged illegality." However, McMillan's First Amendment claims are readily distinguishable from those of the plaintiffs in *Rivera-Powell,* and the logic of that decision is not applicable to this case. As emphasized by the Second Circuit, the plaintiff's First Amendment claim in *Rivera-Powell* was "inextricably intertwined with the question of whether the state afforded her procedurally

adequate process." *Id.* In other words, the plaintiff claimed that her removal from the ballot constituted deprivation of a protected right without due process of law, and that such deprivation interfered with her and her supporters' First Amendment rights to organize, access the ballot, and vote for the candidate of their choice. *Id.* at 468. She "allege[d] no additional deprivation of her First Amendment interests independent from the deprivation that form [ed] the basis of her due process claim." *Id.* McMillan's claims, on the other hand, amount to more than allegations that the City Board deprived him of his First Amendment rights because their established procedures for abbreviating party names were inadequate or because they arbitrarily departed from these established procedures. Rather, McMillan's Establishment Clause claim has an element that clearly distinguishes it from his Due Process claim: that the City Board acted with religious animus. Accordingly, McMillan's First Amendment claims cannot be disposed of as summarily as the City Board suggests.

FN15. In a September 28, 2009 letter sent to the City Board, McMillan claims he was "told that the party name 'Rent Is Too Damn High' was cut down for 'RELIGIOUS REASONS.' " Compl. at 9 (attaching letter). However, McMillan has never made such an allegation before the Court, and when encouraged to identify any facts or evidence that might support his claims, he did not suggest that any evidence existed to support this alleged statement made over a year ago by one of the defendants.

iv. *First Amendment Free Speech and Association*

Construed liberally, McMillan's pleadings might also be read to allege a claim under the First Amendment's free speech and association provisions. Attached to McMillan's original complaint is a letter he sent to the City Board on September 28, 2009, in which he stated that the Board's modification of his party's name on the 2009 ballot "is unconstitutional by way of the 1st Amendment both Free Speech and Establishment Clauses (Separation of Church and State)." Compl. at 9 (attaching letter). Neither McMillan's original complaint nor his amended complaint set out allegations on which a free speech claim might be premised, but at oral argument on his motion for preliminary injunctive relief, McMillan alleged that, by removing the word "Damn" from his party's name, the City Board had undermined his supporters' ability to associate with his party and to cast a meaningful vote. June 16 Trans. at 27 ("The people go to vote, they didn't see us, they didn't vote for us.").

**\*10** The First Amendment does not provide candidates with a right to have their political parties listed on election ballots, nor does it invest them with a right to use ballots as forums for political expression. *See Timmons,* 520 U.S. at 362-63; *Dart v. Brown,* 717 F.2d 1491, 1499 (5th Cir.1983). However, the First Amendment does protect the rights of candidates and their supporters "to organize, access the ballot, and vote for the candidate of their choice." *Rivera-Powell,* 470 F.3d at 468 (citing *Anderson v. Celebrezze,* 460 U.S. 780 (1983)).

Nonetheless, the evidence before the Court cannot plausibly support an argument that the change in McMillan's party designation impaired the ability of his supporters to cast a meaningful vote or to meaningfully associate with their party and candidate of choice. *See Dart,* 717 F.2d at 1499 (a candidate prohibited from designating party membership on a ballot could make out no First Amendment violation where voters had full opportunity to vote for their candidate of choice and have their vote counted). The evidence allows for no reasonable inference that voters who arrived at the polls hoping to support the "Rent Is Too Damn High" party were so frustrated when confronted with a ballot instead designating McMillan as a candidate for the "Rent Is Too High" party that their fundamental right to cast a meaningful vote or to meaningfully associate was violated. Accordingly, to the extent that McMillan has alleged a violation of his freedom of speech or freedom to associate, the City Board's motion for summary judgment is granted.

4. *Permanent Injunction*

McMillan seeks a permanent injunction that would guarantee " 'Rent is 2 Damn High' a lifetime appearance on and in all

State wide ballots and in all voting machines." Am. Compl. at 3. McMillan has offered no basis in law or in logic for allowing him a lifetime pass when it comes to New York law governing ballot access. Dismissal is also appropriate given plaintiff's inability to identify any imminent and irreparable harm, particularly in light of the parties' agreement upon a mutually acceptable abbreviation of McMillan's party's name on future ballots. *See Fort v. Am. Federation of State, County and Municipal Employees. AFL-CIO,* 9-CV-2275, 2010 WL 1718739, at *2 (2d. Cir. Apr. 29, 2010) ("Plaintiff's patent inability to demonstrate imminent and irreparable harm further supports the dismissal of their complaint seeking permanent injunctive relief." (citing *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir.2006))). Accordingly, the City Board's motion to dismiss is granted with respect to McMillan's claim for permanent injunctive relief.

## CONCLUSION

For the reasons stated above, the State Board's motion to dismiss is granted. The City Board's motion to dismiss is granted with respect to all claims for damages accruing prior to June 2, 2007, and with respect to McMillan's claim for permanent injunctive relief. With respect to all remaining claims, the City Board's motion to dismiss is treated as a motion for summary judgment under Rule 56 and is granted. The Clerk is respectfully directed to enter judgment for the defendants and to close the case.

**\*11** So ordered.

E.D.N.Y.,2010.
McMillan v. New York State Bd. of Elections
Slip Copy, 2010 WL 4065434 (E.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Slip Copy, 2011 WL 6061356 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2011 WL 6061356 (C.A.2 (N.Y.)))
**H**
Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.


United States Court of Appeals,
Second Circuit.
James E. McMILLAN, III, Plaintiff–Appellant,

v.

NEW YORK STATE BOARD OF ELECTIONS, New York City Board of Elections, Defendants–Appellees.


No. 10–4728–cv.
Dec. 7, 2011.


**Background:** Political candidate brought § 1983 action against the New York State Board of Elections and the New York City Board of Elections, alleging that elimination of the word "damn" from his party's name violated his constitutional rights. The United States District Court for the Eastern District of New York, Gleeson, J., 2010 WL 4065434, dismissed the candidate's claims in part and granted summary judgment against candidate in part. Candidate appealed.

**Holding:** The Court of Appeals held that candidate's claims against the State Board were barred by the Eleventh Amendment. Affirmed.


West Headnotes


**Federal Courts 170B ⇐269**


170B Federal Courts
 170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
  170BIV(A) In General
   170Bk268 What Are Suits Against States
    170Bk269 k. State Officers or Agencies, Actions Against. Most Cited Cases

 Political candidate's § 1983 claims against the New York State Board of Elections, alleging that elimination of the word "damn" from his party's name violated his constitutional rights, were barred by the Eleventh Amendment. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.


Appeal from a judgment of the United States District Court for the Eastern District of New York (Gleeson, J.).James E. McMillan, III, Brooklyn, N.Y., pro se.

Claude S. Platton, Assistant Solicitor General; Barbara D. Underwood, Solicitor General; Benjamin N. Gutman, Deputy Solicitor General; Richard O. Jackson, Assistant Solicitor General (of counsel); for Eric T. Schneiderman, Attorney General of the State of New York, New York, N.Y., Francis F. Caputo & Scott Shorr (of counsel), for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, N.Y., for Appellees.

## SUMMARY ORDER

*1 UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is AFFIRMED.

James E. McMillan, III, *pro se,* filed suit against the New York State Board of Elections (the "State Board") and the New York City Board of Elections (the "City Board") under 42 U.S.C. § 1983. The defendants moved to dismiss his complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). The district court granted the State Board's motion to dismiss in its entirety. With respect to claims against the City Board, the district court dismissed the claims in part and treated the City Board's motion to dismiss any remaining claims as a motion for summary judgment, which the court granted. McMillan appeals from the district court's dismissal of his claims and grant of summary judgment against him. We assume the parties' familiarity with the underlying facts and the issues on appeal.

We review a district court's decision to dismiss a complaint or to grant summary judgment *de novo. See Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003); *Jaghory v. N.Y. State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). A complaint must be dismissed under Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate" the case. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Miller,* 321 F.3d at 300. Additionally, because McMillan appeals *pro se,* we must consider his claims with "special solicitude," interpreting them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (per curiam) (internal quotation marks omitted).

The district court correctly dismissed McMillan's claims against the State Board as barred by the Eleventh Amendment. *See Iwachiw v. N.Y.C. Bd. of Elections,* 126 F. App'x 27, 28 (2d Cir.2005) (summary order).

McMillan's claims against the City Board arising from the 2006 election are governed and indeed barred by New York's three-year statute of limitations because he filed his complaint in June 2010. *See Shomo v. City of N.Y.,* 579 F.3d 176, 181 (2d Cir.2009).

Finally, his claims against the City Board arising from the 2009 election fail for the reasons stated by the district court. We note that the City Board sent McMillan notices in August 2009 and in September 2009 informing him that his party's name exceeded the statutory limit and requesting that he provide his preferred shortened version by September 18, 2009. McMillan, however, only responded on October 5, 2009, shortly before the November election.

*2 We have considered McMillan's remaining arguments and find them to be without merit. Accordingly, we AFFIRM the

judgment of the district court.

C.A.2 (N.Y.),2011.
McMillan v. New York State Bd. of Elections
Slip Copy, 2011 WL 6061356 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**CERTIFICATE OF SERVICE**

JOEL GRABER, an attorney duly admitted to practice in the State of New York and before this Court, certifies under penalty of perjury that on February 21, 2012, he caused the within WESTLAW CASES CITED IN DEFENDANT'S MEMORANDUM OF LAW to be served upon the following plaintiff *pro se*:

*VIA EXPRESS MAIL/OVERNIGHT DELIVERY:*

James E. McMillan III
1996 Nostrand Ave.
Brooklyn, NY 11210-1547

*AND VIA E-MAIL:*

rentisto@aol.com

Dated:    New York, New York
          February 21, 2012

_____
JOEL GRABER
Special Litigation Counsel
State of New York