| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | <u>ONLINE PUBLICATION ONLY</u> |

| | |
|---|---|
| JAMES McMILLAN,<br>                                        Plaintiff,<br><br>                  - versus -<br><br>NEW YORK STATE BOARD OF<br>ELECTIONS,<br>                                        Defendant. | <u>MEMORANDUM<br>AND ORDER</u><br><br>12-CV-302 (JG) |

A P P E A R A N C E S :

        JAMES McMILLAN
            1996 Nostrand Avenue
            Brooklyn, NY 11210
            Plaintiff, *Pro Se*

        ERIC T. SCHNEIDERMAN
            Attorney General of the State of New York
            120 Broadway, 24th Floor
            New York, NY 10271
        By:   Joel Graber
            Special Litigation Counsel
            *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        James ("Jimmy") McMillan, *pro se*, brings this action against the New York State Board of Elections (the "Board"), seeking an injunction requiring the Board to recount all ballots from the 2010 gubernatorial election in which McMillan, representing the "Rent Is 2 Damn High" party, was a candidate.  The Board has moved to dismiss McMillan's complaint on the grounds that the Board is immune from suit and the complaint fails to state a claim upon which relief may be granted.  For the reasons explained below, the motion is granted, and McMillan's complaint is hereby dismissed.

BACKGROUND

In 2010, McMillan ran for Governor of New York on behalf of the "Rent Is 2 Damn High" party. According to the Board, McMillan received 41,131 votes, out of a total of 4,763,688 votes cast in the election. On January 23, 2012, in an effort to reach the 50,000 vote threshold required under New York law to qualify as an official political Party,[1] McMillan filed this suit seeking an order compelling the Board to recount all ballots cast in the 2010 election. Compl., ECF No. 1. He has also suggested in his more recent submissions that he would like the court to "ORDER the Rent Is 2 Damn High Party on the Ballot for the next Four (4) years because of the New York State Board of Elections['s] reckless behavior,"[2] as well as to "ORDER [the Board] to be transparent on the total number of VOTES that were not counted due to OVERVOTE." 4/11/12 Letter from McMillan, ECF No. 18, at 1-2.

On March 16, 2012, I entered an order denying McMillan's application for a preliminary injunction mandating a recount of all ballots cast in the 2010 gubernatorial election. *See McMillan v. N.Y. State Bd. of Elections*, No. 12-CV-302 JG, 2012 WL 909934 (E.D.N.Y. Mar. 16, 2012). Although this order denied the primary relief that McMillan sought through this lawsuit, I did not dismiss the complaint at that time because of the preliminary nature of the injunctive request. The Board has since moved to dismiss the complaint for failure to state a claim. *See* Mo. To Dismiss, ECF No. 19. Oral argument was held on July 10, 2012.

---

[1] Under New York election law, a political organization is considered an official political "Party" only if its "candidate in the preceding gubernatorial election received at least 50,000 votes." *Dillon v. N.Y. State Bd. of Elections*, No. 05-CV-4766 (JG), 2005 WL 2847465, at *1 (E.D.N.Y. Oct. 31, 2005) (citing N.Y. Elec. Law § 1-104(3)). "An organization that participates in the campaign and election process but did not receive the requisite number of votes in that election to achieve 'Party' status is defined as an 'independent body.'" *Id.* (citing N.Y. Elec. Law § 1-104(12)). An organization that has attained "Party" status enjoys certain privileges, including that, for the next four years, its candidates may "participate in the primary process instead of the independent nomination petition course provided in [New York Election Law] § 6-138(4)." *Johnson v. Cuomo*, 595 F. Supp. 1126, 1129 (N.D.N.Y. 1984). This opinion uses "Party" with an uppercase "P" to refer to the type of political party that has achieved official "Party" status within the meaning of New York Election Law § 1-104(3).

[2] McMillan reiterated at oral argument that he would prefer that the court simply certify the Rent Is 2 Damn High party as an official political Party and forgo the recount.

2

DISCUSSION

A.      *Standard of Review*

To survive a motion to dismiss, a complaint must allege sufficient facts to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 173 (2d Cir. 2012). In making this determination, a court should assume all well-pleaded allegations in the complaint to be true "and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Because McMillan is proceeding *pro se*, I am specially obligated to construe his complaint liberally and interpret it "to raise the strongest arguments that [it] suggest[s]." *See Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006) (internal quotation marks omitted).

B.      *Analysis*

    1.      *Sovereign Immunity*

As I explained in a related dispute between the same parties in 2010, the Eleventh Amendment bars individuals from bringing suit for money damages or injunctive relief against a state or its agencies "unless either Congress has clearly abrogated the state's immunity or the state has unequivocally waived its immunity." *McMillan v. N.Y. State Bd. of Elections*, No. 10-CV-2502 (JG) (VVP), 2010 WL 4065434, at *3 (E.D.N.Y. Oct. 15, 2010) (citing *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)), *aff'd*, 449 F. App'x 79 (2d Cir. 2011); *see* U.S. Const. amend. XI. The State Board of Elections is a state agency for the purposes of the Eleventh Amendment. *See McMillan*, 2010 WL 4065434, at *3. McMillan has not identified a particular legal basis for his claim, and the only federal basis of his claim I can discern is 42 U.S.C. § 1983. Section 1983 does not abrogate the sovereign immunity of the states. *Quern v. Jordan*, 440 U.S.

3

332, 342-43 (1979). Nor has the state waived its immunity in this case. Therefore, the Board is immune from suit and McMillan's claims must be dismissed.[3]

    2.    *Failure To State a Claim*

As I explained in my order denying a preliminary injunction in this case, McMillan's complaint also fails to state any legally plausible claim.

    a.    *State Election Law Claim*

As I explained in March, McMillan is time-barred from seeking a remedy under state election law. New York Election Law § 16-106 provides that any voter may contest the state's "canvass of returns," *i.e.*, vote count, by instituting a proceeding in state court within 30 days after the election. *See* N.Y. Elec. Law § 16-106(2), 16-106(5). Because the 2010 gubernatorial election occurred on November 2, 2010, the latest date McMillan could have challenged the vote count under New York Election Law § 16-106 was December 1, 2010. McMillan filed no such action. This action, filed in January 2012, is far too late.

    b.    *Due Process*

Nor may McMillan convert his state election law claim into a federal due process claim. "[T]he due process clause 'offer[s] no guarantee against errors in the administration of an election,' at least where state law provides a fair and adequate method for correcting such errors." *Gold v. Feinberg*, 101 F.3d 796, 800 (2d Cir. 1996) (quoting *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970)). State law afforded McMillan an opportunity to contest the vote count and seek a recount through Election Law § 16-106. McMillan "do[es] not contest the fairness and adequacy of that remedy." *Cf. Powell*, 436 F.2d at 88. Thus, McMillan "was not deprived of an opportunity to be heard[;] rather []he chose not to avail [himself] of the process, and cannot now

---

[3] Because I find that McMillan's § 1983 claim(s) against the Board are barred by the Eleventh Amendment, I need not reach the Board's alternative argument that the Board is not a "person" for purposes of § 1983. *See* Def.'s Mem. at 9-10, ECF No. 20.

4

inappropriately bring an action in federal court." *See Minnus v. Bd. of Elections in City of New York*, No. 10-CV-3918 (NG) (RML), 2010 WL 3528544, at *4 (E.D.N.Y. Sept. 3, 2010); *see also Monserrate v. N.Y. State Senate*, 599 F.3d 148, 159 (2d Cir. 2010) (holding that there is no violation of due process where plaintiff was afforded an "opportunity to present reasons, either in person or in writing, why proposed action should not be taken, but declined to avail himself of that opportunity" (internal quotation marks and citation omitted)).  Accordingly, McMillan's allegations fail to make out a due process violation.

        c.      *Religious Discrimination*

As I observed in my prior opinion, McMillan's complaint "atmospherically suggests a religious-discrimination basis for his claim," based on the Board's alleged antipathy toward the word "damn" in McMillan's chosen party name. *McMillan*, 2012 WL 909934, at *2. In his complaint, McMillan made reference to the Board officials' "Religious beliefs," *see* Compl. at 2, and even after my prior opinion, McMillan apparently continues to press a religious basis for his claim, stating in his opposition to the present motion, "I ask the Court to ORDER a recount because the Religious Leaders (Executives) of the New York State Board of Election has tried in every way . . . (until ordered on by the Court in 2010) to keep the wor[d] 'DAMN' off of the New York State Ballot [because] to them the word 'DAMN' was and is offensive and is a Curse Word," McMillan Opp. at 1, ECF No. 21.

As McMillan himself acknowledged both in his papers and at oral argument, McMillan's dispute with the Board regarding the word "damn" was resolved back in 2010. *See McMillan v. N.Y. State Bd. of Elections*, No. 10-CV-2502 (JG) (VVP), 2010 WL 4065434 (E.D.N.Y. Oct. 15, 2010).  McMillan's complaint does not suggest that the word "damn" was

5

excluded from the 2010 gubernatorial ballots at issue in this lawsuit.[4]  Accordingly, McMillan has not plausibly alleged a claim for religious discrimination.

        d.     *Voting Rights Act*

In his opposition memorandum, McMillan makes reference for the first time to the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.*  *See* McMillan Opp. at 2 ("The New York State Board of Elections complained about what it would cost to do a Re-Count but had NO consideration of what it had already cost to the votes of there Constitutional Rights being disenfranchise under the Voting Rights Act of 1965 . . . .").

The Voting Rights Act prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  42 U.S.C. § 1973(a).  The Act was designed "to rid the country of racial discrimination in voting," by "provid[ing] stringent new remedies against those practices which have most frequently denied citizens the right to vote on the basis of their race."  *Allen v. State Bd. of Elections*, 393 U.S. 544, 548 (1969).

McMillan offers not even the slightest hint of a supporting allegation for the claim that the Board somehow violated the Voting Rights Act.  Nowhere in McMillan's complaint or in his numerous court filings is there a suggestion of any citizen whose right to vote was in any way impeded on account of race or color.  Thus, even if McMillan could amend his complaint through statements made for the first time in his opposition papers, which he may not, *see Wright*

---

[4] Indeed, although for purposes of this motion I am limited to considering the allegations on the face of the complaint, the Board submitted a photocopy of the ballot used in the 2010 gubernatorial election, and McMillan's political affiliation is plainly denoted as the "Rent Is 2 Damn High."  *See* 3/26/12 Letter from Board at 3, ECF No. 17 (attaching sample ballot); *see also* 4/11/12 Letter from McMillan at 8-11, ECF No. 18 (attaching sample ballots).

*v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998), any claim under the Voting Rights Act would be utterly unsupported and frivolous.

        3.      *U.S. Election Assistance Commission Report*

None of my analysis is altered by McMillan's submission of a Formal Investigation Report on the Election Systems and Software Unity 3.2.0.0, published by the U.S. Election Assistance Commission ("EAC") in December 2011. *See* EAC Report, ECF No. 21-2; *also available at* http://www.eac.gov/assets/1/Documents/Formal_Investigation_ESS_Unity_3200_Final_12.20.11.pdf. The report contains some troubling findings about the operation of a particular optical scanning machine known as the Election Systems & Software (ES&S) DS200 Precinct Count Optical Scanner in the Unity 3.2.0.0 EAC certified voting system. *See* EAC Report, at iii. The report substantiated three anomalies of those machines: (1) intermittent screen freezes, lockups, and shutdowns; (2) failure to log all voting system events; (3) skewing of ballots resulting in inaccuracy. *Id.*

McMillan purports to rely on the EAC Report to show that "[t]he DS200 Scanning Voting Machine used in the 2010 Gubernatorial Election . . . was not working properly casting reasonable doubt that the Rent Is 2 Damn High Party got more voted than was reported." McMillan Opp. at 2. Perhaps relatedly, McMillan complains that the word "High" in his party name was printed in the "No Print Zone" on the ballot, "[m]eaning it is possible many votes for the 'Rent Is 2 Damn High Party' were not counted." *Id.* at 1.

Although the EAC findings are troubling, they have no bearing on the merits of this lawsuit. In the first place, the Board contends that the software system used in New York is not the same as the one reviewed in the EAC Report. *See* Bd. Reply at 8 ("ES&S is not certified by the State Board for use in New York, and has not been used by New York local election

7

administrators.  The State Board certified a different ES&S system, called DS-200 v.2.1.0.0.").  Moreover, none of the problems identified in the report suggests a propensity to afflict McMillan or the Rent Is 2 Damn High party disproportionately more than any other candidate.[5]

McMillan has directed the court's attention to the ballot skew problem, in which when ballots travel past the image sensor at an angle, sometimes the machine will misread printed text as a marked oval, and thus mistakenly register a vote.  McMillan claims the word "High" of his name was printed in the "No Print Zone," suggesting it might trigger a ballot skew problem.  However, even if the ballot skew problem existed in New York, and even if the location of the word "High" really were in a location to trigger it,[6] it would only have inured to McMillan's benefit, as his party would have been credited with votes where they had received none.[7]  Thus, the printing of the word "High" in the "No Print Zone" cannot justify a recount in search of additional votes for McMillan.

---

[5] McMillan's claim has been a moving target.  At oral argument, he suggested for the first time that the State Board intentionally deployed the questionable DS200 Voting Machines in poor urban areas where he tends to get the most votes, and did so for the purpose of undercounting the votes for McMillan.  In support of that suggestion, McMillan presented a map that he claims depicts the counties in which the DS200, as opposed to the apparently well-functioning ImageCast machines, were used.  *See* ECF No. 25 (map); *see also* 4/11/12 Letter from McMillan, ECF No. 18, at 4-6 (listing voting-machine type by county).  That allegation of intentional discrimination was not among the claims in McMillan's original complaint, and I decline to grant McMillan – who has moved the court for an expedited decision on his complaint, *see* ECF No. 24 – leave to amend his complaint to assert it now.  I further note that McMillan does not appear to claim that the defective machines failed to record votes for him except in the context of the ballot skew problem discussed below.  Thus, even if the intentional discrimination he has belatedly raised in fact occurred, there is no reason to think that it would have resulted in a 20% undercount of the votes for McMillan.

[6] Although my examination of the 2010 ballot confirms that the word "High" does appear on a second line in McMillan's party name, the EAC Report's description of the ballot skew problem provides no reason to think that this position is problematic.  The EAC Report instead cautions against printing any text or graphics within 0.20 inches from the edge of the oval that a voter would fill in to place her vote.  *See* EAC Report, App. A.  The word "High" is not near any voting ovals, and indeed is farther from any voting ovals than much of the other text on the ballot – including the candidate names.

[7] McMillan pointed out at oral argument that another possible result of a ballot skew problem is that the ballot may be discarded as an overvote.  I explained the so-called "overvote" problem in my opinion in March.  *See McMillan*, 2012 WL 909934, at *2.  McMillan is correct that if a machine read a ballot as attempting to cast two votes in the same race, it would discard the ballot as overvoted.  However, the closest oval to the word "High" was McMillan's own oval; thus, in the unlikely event that the placement of the word "High" tricked the voting machine into counting an unmarked oval as marked, the oval would have been McMillan's own.  An overvote problem would exist only if the voter had filled in an oval for a different candidate, thus resulting in two votes.  By contrast, if the voter had marked the oval to vote for McMillan, the word "High" would have no effect on the machine's reading of

CONCLUSION

Because McMillan has not set forth any claim in his complaint on which relief may be granted, and because the New York State Board of Elections is protected from suit by the Eleventh Amendment, the Board's motion to dismiss is granted in its entirety and McMillan's complaint is hereby dismissed.

So ordered.

John Gleeson, U.S.D.J.

Dated: July 11, 2012
      Brooklyn, New York

---

the ballot, as it would view the oval as marked for McMillan either way. Thus, by McMillan's own logic, McMillan is actually the only candidate that I may be confident was *not* prejudiced by any ballot skew problem resulting from the placement of the word "High."